UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

KENNETH D. PASKAR and FRIENDS OF          :
LAGUARDIA AIRPORT, INC.,

                    :

                    Plaintiffs,           :

          -against-                       :

THE CITY OF NEW YORK and NEW YORK         :
CITY DEPARTMENT OF SANITATION,            :

                    Defendants.           :

-----------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-10-14

13 Civ. 5897 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

> Plaintiffs Kenneth D. Paskar and Friends of LaGuardia Airport, Inc. ("FOLA") (a
not-for-profit corporation which advocates for the elimination of aviation safety hazards—Mr.
Paskar is the President), bring this action against the City of New York and the New York City
Department of Sanitation ("DSNY")(collectively, "Defendants"), claiming that the construction
and operation of the North Shore Marine Transfer Station in College Point, Queens, immediately
across Flushing Bay from LaGuardia Airport, violates the Resource Conservation and Recovery
Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A).[1] They seek declaratory and injunctive relief because
of the City's and DSNY's alleged failure to comply with 40 C.F.R. § 258.10[2] and 49 U.S.C. §

---

[1] 42 U.S.C. § 6972(a) provides that "any person may commence a civil action on his own behalf against any person .
. . who is alleged to be in violation of any permit, standard, regulation . . . which has become effective pursuant to
this chapter. . . ."

[2] 40 C.F.R. § 258.10 provides that prior to the construction of a solid waste facility that is within five miles of an
airport, the owner of the facility must take certain actions, including demonstrating that the solid waste facility will
not pose a bird strike hazard to aircraft.

44718(a).[3]  (Am. Compl., ¶¶ 2, 3).  Plaintiff alleges that the construction and operation of the

North Shore Marine Transfer Station ("NSMTS") is "an aviation hazard due to the fact it will

increase the risk of bird strikes"  (Am. Compl., ¶ 3);  and "building a garbage dump at the end of

Runway 31 at LaGuardia is a ludicrous idea." (Pl. Opp. Memo. at 3.)  The gravamen of Mr.

Paskar's and FOLA's complaint is that the garbage and waste received and processed at the

NSMTS will attract birds which will in turn cause airplanes to fall "from the sky due to a bird

strike at LaGuardia."[4]  (Id. at 4).  Review of the construction and operation of the facility is

sought because the facility allegedly violates the RCRA.

Defendants move to dismiss the Amended Complaint for two reasons: (1) the

transfer facility is not a municipal solid waste landfill ("MSWLF"), and is not subject to 40

C.F.R. 258; and (2) in any event, there is no private right of action to enforce 49 U.S.C. §

44718(a)(1) and (2).  Plaintiffs respond that (1) the allegation that the North Shore Marine

Transfer Station meets the definition of a landfill under the RCRA and should be regulated as

such, raises a question of fact sufficient to survive a motion to dismiss; and (2) though not

explicit, there is an implied private right of action under 49 U.S.C. § 44718(a)(1) and (2).

For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

This is not Plaintiffs' first trip to the Courthouse to stop the construction of the

NSMTS.  Similar arguments have been made to federal and state courts, as well as federal and

state agencies on four prior occasions.  None has been successful.  In order to put the current

pleading in context, however, each of them is briefly summarized:

---

[3] 49 U.S.C. § 44718(a) provides that the "Secretary of Transportation shall require a person to give adequate public notice . . . of the construction, alteration . . . or expansion . . . of a structure or sanitary landfill . . . ."  Sanitary landfills are defined as facilities receiving "putrescible waste", 49 U.S.C. § 44718(d)(1).
[4] A "bird strike" occurs when a plane hits a bird while the plane is in flight.  It is a serious flight hazard.

(1)      Plaintiffs initiated an administrative challenge before the Federal Aviation

Agency ("FAA"), pursuant to 14 C.F.R. Part 16, claiming that the City's construction of the

NSMTS violated various assurances made in agreements between the FAA and the Port

Authority of N.Y. and N.J. ("Port Authority") for funding of LaGuardia Airport.  The FAA

found that the City was neither a signatory nor a party to the grant agreements, nor was the City a

proper "respondent" under 14 C.F.R. § 16.3.  While the City owns the land on which LaGuardia

Airport is built, it is neither a sponsor nor an operator of the airport within the meaning of the

regulation.

Upon review of the FAA's administrative determination, the Second Circuit held

that

> [The FAA's] factual findings were supported by substantial
> evidence, and its application of the law to the facts is not arbitrary
> or capricious, or an abuse of discretion, or otherwise contrary to
> law . . . . Although the City owns the land upon which LaGuardia
> Airport sits, the Port Authority is the operator of LaGuardia and
> leases the land from the City.  The City does not qualify as a
> 'sponsor' under the terms of the grant agreement, statute, see 49
> U.S.C. § 47102(26) or regulations, see 14 C.F.R. § 16.3, because it
> is not an agency that receives financial assistance from the FAA.
> The City is not a 'proprietor' because ownership alone is not
> sufficient to warrant proprietor status as the City does not 'operate'
> the airport.

Paskar v. F.A.A., 478 F. App'x 707, 708 (2d Cir. 2012).

(2)      Plaintiffs initiated an Article 78 proceeding against the New York State

Department of Environmental Conservation ("DEC") and DSNY in December, 2010.  Plaintiffs

complained of the on-going construction of the NSMTS, especially in light of the hazard of bird

strikes.  In that connection, Plaintiffs cited the bird strikes that occurred at LaGuardia when

migratory birds collided with U.S. Airways, Flight 1548, upon takeoff on January 15, 2009.  But

for the great skills of the captain, co-captain and the crew, the flight would have ended in

disaster, instead of resulting in the "Miracle on the Hudson." Notwithstanding this vivid example of the danger of bird strikes, the DEC refused Plaintiffs' demand to conduct further studies before proceeding with the construction of the NSMTS. Instead of doing an entire reanalysis, DEC merely modified its permit to include DSNY's agreement to amend the DEC permit to include airways' warning lights of the NSMTS.

The New York State Supreme Court held that FOLA had no standing to commence and maintain the action against the City since it was not incorporated at the time Paskar commenced the Article 78 proceeding. While Mr. Paskar had standing to challenge the DEC's failure to respond to his November 12, 2010 letter demanding that DEC conduct a new study, Mr. Paskar could not "compel the DEC or the DSNY to act in any particular manner in connection with the subject permit . . . . [I]t is for the DEC, and not the Court, to determine whether a permit issued by said agency should [be] modified, suspended, or revoked." Paskar v. Dep't of Envtl. Conservation, 33 Misc. 3d 1226(A), at *5–6 (N.Y. Sup. Ct. Queens Cnty. 2011). Mr. Paskar's petition was dismissed. Id. at *6.

(3)     Last year, the Second Circuit considered whether the FAA's September 2, 2010 letter to the City of New York constituted a final order subject to review, as Mr. Paskar and FOLA contended; or not a final order, and therefore beyond the Court's jurisdiction to review. The FAA's letter agreed with an expert panel's conclusion that the City's plans to construct and operate a marine transfer station in College Point, Queens (in the immediate vicinity of LaGuardia Airport) would be compatible with safe air operations, as long as several recommendations are followed.

That determination was based on a record which included actions the City took after the FAA conducted aeronautical studies. In 2006, the City agreed to reduce the height of the

proposed transfer facility from 110' to 100' and to move the facility out of the runway protection
zone. The Port Authority, LaGuardia's operator, accepted the changes and withdrew its petition
for review. When the City altered its design of the NSMTS, the FAA conducted another
aeronautical study. On September 19, 2008, the FAA issued a No Hazard determination, so long
as the facility was equipped with proper lighting.

Four months after the second No Hazard determination, in January, 2009, U.S.
Airways Flight 1549, while on take-off from LaGuardia, flew into a flock of migrating birds,
resulting in what would have been a disaster, but for the highly skilled and heroic actions of the
pilot, co-pilot and flight crew. Opponents of the NSMTS seized on the near-disaster to renew
arguments against the NSMTS: that the facility would attract birds which would increase the risk
of bird strikes, and perhaps result in plane crashes.

In the fall of 2009, the Secretary of Transportation convened a panel of experts,
including the FAA, USDA, U.S. Air Force, as well as state and local agencies, to review and
study the impact of the NSMTS on the safe operations at LaGuardia. The panel issued its report
on September 2, 2010, concluding that the transfer station is compatible with safe air operations,
so long as it is constructed and operated in accordance with the expert panel's recommendations.
The City accepted the panel's recommendations and proceeded with the construction in
accordance with the recommendations.

Mr. Paskar and FOLA sought review of the September 2, 2010 letter.
Respondents DOT/FAA, and the City as intervener, moved to dismiss. A motion panel of the
Second Circuit denied the motion to dismiss, holding that the September 2, 2010 letter was an
"Order" and appropriate for review. Paskar v. United States Dep't of Transp., 2011 U.S. App.
LEXIS 26564, at 2 (2d Cir. Apr. 6, 2011). The merits panel, however, disagreed, and held that

5

the September 2, 2010 FAA letter was not a final order.  The Court construed the September 2,

2010 expert panel's report as a recommendation which "imposed no obligation, denied no right,

and fixed no legal relationship."  Paskar v. United States Dep't of Transp., 714 F.3d 90, 97 (2d

Cir. 2013).  The City could have accepted or rejected the expert panel's recommendation

"without recourse by any party," Id. at 96:

> "In the present case, the FAA letter does not pose a practical
> 'stumbling block' to the construction of the North Shore Station.
> The letter is not a No Hazard determination.  FAA aeronautical
> studies in 2006 and 2008 had already determined that the Station
> posed No Hazard to air navigation.  The panel report was
> consistent with those determinations, and neither created, nor
> removed, a 'stumbling block.'  Nothing in the recommendations of
> the panel, or the Letter, ordered the City to do anything, or to desist
> from doing anything.  No other regulatory agency awaited the
> issuance of the panel report, and no financing or insurance was
> conditioned on the content of the Letter."

> Id. at 99.

(4)    The fourth and final action is an Article 78 proceeding initiated by Mr. Paskar and

FOLA against the NYS Department of Environmental Conservation, Joseph Martens and DSNY.

On February 5, 2013, counsel for Mr. Paskar and FOLA withdrew the petition. See

Paskar v. Dep't Envtl. Conservation, No. 104076/2012, at 3 (N.Y. Sup. Ct. New York Cnty. Feb.

8, 2013).  New York Supreme Court Justice Peter H. Moulton filed an order stating: "Article 78

Proceeding is Withdrawn." Id. at 1.

Having summarized these prior administrative and judicial actions, we turn to the

Plaintiffs' fifth action to stop that portion of the City's Solid Waste Management Plan which

calls for the shipping of residential garbage created in the Borough of Queens, via a Marine

Transfer Station built on the shoreline of Flushing Bay, just across from LaGuardia Airport.

6

## DISCUSSION

### I. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a Complaint if a plaintiff fails to "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Plaintiffs must allege "'enough facts to state a claim to relief that is plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations and draw all inferences in a plaintiff's favor. See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006). Allegations that are merely conclusory are "not entitled to be assumed true." Iqbal, 556 U.S. at 680.

In evaluating a motion to dismiss, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which [he] relied in bringing the suit." ATSI, 493 F.3d at 98. "Courts may also properly consider 'matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" Halebian v. Berv, 644 F.3d 122, 131 n. 7 (2d Cir. 2011). "Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions." Schenk v. Citibank, No. 10–CV–5056, 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010). Official government reports and other types of

7

government records are appropriate for judicial notice. See B.T. Produce Co. v. Robert A. Johnson Sales, Inc., 354 F. Supp. 2d 284, 285 (S.D.N.Y. 2004); Massachusetts v. Westcott, 431 U.S. 322 (1977).

## II. Analysis

### 1. The North Shore Marine Transfer Facility Is Not Subject to RCRA Part 258

Plaintiffs argue that the North Shore Marine Transfer Station is regulated under the Resource Conservation and Recovery Act ("RCRA") as a municipal solid waste landfill. Plaintiffs submit that "the North Shore MTS is a 'MSWLF' unit, as that term is defined in 40 C.F.R. § 258.2 such that the City is required to comply with 40 C.F.R. § 258.10." (Pl. Opp. Memo. at 9). The Amended Complaint alleges precisely that, at paragraph 47. [5] Plaintiffs argue that, because they have alleged that the marine transfer station is a landfill, they have alleged facts that, if true, state a cause of action; thus, their claim is sufficient to survive a motion to dismiss.

Whether transfer stations are municipal solid waste landfills, and therefore subject to the RCRA, is a question of law. The answer to the question is clear: they are not. Transfer stations are distinct from landfills in that they receive waste only temporarily for the purpose of packaging and transporting it to permanent disposal sites. 40 C.F.R. deals with "Protection of Environment" and sets forth the rules and regulations of the Environmental Protection Agency, promulgated pursuant to the RCRA, among other statutes, governing radiation protection (40 C.F.R. § 190-197); noise abatement (40 C.F.R. § 201-211); ocean dumping (40 C.F.R. § 220-238); and solid wastes (40 C.F.R. § 239-258). Part 243 provides Guidelines for "the storage and collection of residential, commercial and industrial solid waste." The regulations cover the

---

[5] See Complaint at ¶ 47 ("As described in ¶¶ 16-41 above, the proposed North Shore MTS is a MSWLF unit that is proposed to be located within 10,000 feet of an airport that uses turbojet or piston type aircraft.")

generation of solid waste, its collection (including how it is to be collected) and the storage of

solid waste prior to ultimate disposition.  In that connection, it defines a transfer station as "a site

at which solid wastes are concentrated for transport to a processing facility or land disposal site.

A transfer station may be fixed or mobile."  40 C.F.R. § 243.101(dd).

The definition of the term "transfer stations" in the regulations must be borne in

mind when considering other facilities.  The EPA has prepared a 50-page manual with a 10-page

Appendix, entitled "Waste Transfer Stations: A Manual for Decision-Making" (the "Manual").

U.S. Envtl. Prot. Agency, Waste Transfer Stations: A Manual for Decision-Making 49 (2002),

available at http://www.epa.gov/osw/nonhaz/municipal/pubs/102002.pdf (last accessed Mar. 5,

2014). The EPA's Manual describes what waste transfer stations are, and by implication, what

they are not:

> [A]ll [waste transfer stations] serve the same basic purpose—
> consolidating waste from multiple collection vehicles into larger
> high volume transfer vehicles for more economical shipment to
> district disposal sites . . . [A] transfer station is a facility with a
> designated receiving area where waste collection vehicles
> discharge their loads.  The waste is often compacted, then loaded
> into larger vehicles (usually transfer trailers, but intermediate
> containers, railway, and barges are also used) for long haul
> shipments to a final disposal site—typically a landfill, waste to
> energy plant, or a composting facility.  No long-term storage of
> waste occurs at a transfer station; waste is quickly consolidated and
> loaded into a larger vehicle and moved off site, usually in a matter
> of hours.

Manual at 1-2.  The EPA has provided further guidance on what a transfer station is, stating

"Waste transfer stations are facilities where municipal solid waste is unloaded from collection

vehicles and briefly held while it is reloaded onto larger long-distance transport vehicles for

shipment to landfills or other treatment or disposal facilities." Transfer Stations, U.S. Envtl. Prot.

Agency (Jan. 10, 2014), http://www.epa.gov/epawaste/nonhaz/municipal/transfer.htm.)
(emphasis added).

As the regulations define the term "Transfer station," they also define the term
"Landfill." 40 C.F.R. § 257.2 defines "Landfill" as "an area of land or an excavation in which
wastes are placed for permanent disposal, and that is not a land application unit, surface
impoundment, injection well, or waste pile."  Hence, while a transfer station only temporarily
stores waste so that it can be transferred to another facility, a landfill disposes of waste
permanently.

Plaintiffs attempt to avoid the obvious by arguing that nothing in the definition of
a municipal solid waste landfill unit states that it "has to be a 'landfill'" or that it must dispose of
household waste. (Pl. Opp. Mem. at 12.)  Plaintiffs cite 40 C.F.R. 258.2 for their definition of a
MSWLF unit.  They claim that a transfer station meets the basic definition of a MSWLF unit,
which is "a discrete area of land or an excavation that receives household waste." 40 C.F.R.
258.2.

Plaintiffs' claim is meritless.  Municipal solid waste landfills are, as both their
title and common sense suggests, a type of landfill under the regulations.  Plaintiffs conveniently
neglect to mention that the same definition of MSWLF unit which they cite states "Such a
landfill may be publicly or privately owned." 40 C.F.R. § 258.2 (emphasis added).  The
definition of an MSWLF, therefore, incorporates the definition of a landfill by reference.  As
such, municipal solid waste landfills must be "areas of land in which wastes are placed for
permanent disposal."  A transfer station is not an MSWLF because a transfer station does not
permanently dispose of waste.

10

In a last-ditch attempt to avoid this conclusion, Plaintiff implies in a footnote in its opposition brief that the definition of a landfill is inapplicable to MSWLFs as defined in Part 258 because "landfill" is not defined in Part 258, bur rather in Part 257. This argument also lacks merit. The terms MSWLF unit and "landfill" are both defined in the same section of the regulations: Part 257. The definition of a MSWLF unit in Part 258 which Plaintiff cites is identical to Part 257's definition. It would defy logic and basic principles of statutory interpretation to say that one definition should be interpreted differently from the other, which is contained in the same set of regulations and uses the exact same language.

Furthermore, the EPA has explicitly said that "No federal regulations exist that are specifically applicable to transfer stations." Manual[6] at 49 (emphasis added). While waste transfer stations are not subject to federal regulation, that does not mean that they are unregulated. Indeed, waste transfer stations are denominated and closely regulated in New York by the New York State Department of Environmental Conservation.

In sum, the two concepts—transfer stations and landfills—are quite different, and there is nothing in 40 C.F.R. Part 258 that supports or even suggests that a transfer station can become a landfill simply because it is located close to an airport. There are three other marine transfer stations in New York City, and dozens of land-based transfer stations, and no one has considered calling them landfills. Definitions are not as malleable as Plaintiffs assert. Since transfer stations are not federally regulated as such, it would be anomalous to regulate them as landfills, and Plaintiffs' wholly implausible analysis does not change this.

According to Plaintiffs the question of whether this particular marine transfer station is truly a transfer station or is instead a landfill is a question of fact, because that is what

---

[6] The EPA website cites the Manual as the most current EPA document on waste transfer stations. See Transfer Stations, U.S. Envtl. Prot. Agency (Jan. 10, 2014), http://www.epa.gov/epawaste/nonhaz/municipal/transfer.htm (last accessed Mar. 5, 2014).

they have alleged.  But Plaintiffs' allegations cannot transmogrify a marine transfer station into a

solid waste landfill.  Plaintiffs' allegations that the North Shore Marine Transfer Station is really

a landfill masquerading under the wrong name are conclusory and do not meet the plausibility

standard of Twombly and Iqbal.  Indeed, the NSMTS has been built and permitted by the state,

but Plaintiffs have alleged no facts to support that the transfer station will be anything other than

what it is. [8]  The NSMTS, which collects and consolidates waste for transport to a processing

facility or land disposal site, fits squarely into the definition of a transfer station, and is not

subject to federal regulation.

### 2.  Plaintiff's 49 U.S.C. § 44718 Claims Fail as a Matter of Law

Plaintiffs allege a violation of the Federal Aviation Act, 49 U.S.C. §§

44718(a)(1) and (2), which provides:

> (a)  Notice – By regulation or by order when necessary, the
> Secretary of Transportation shall require a person to give adequate
> public notice, in the form and way the Secretary prescribes, of the
> construction, alteration, establishment, or expansion, or the
> proposed construction, alteration, establishment, or expansion, of a
> structure or sanitary landfill when the notice will promote—
> (1)  safety in air commerce; and
> (2)  the efficient use and preservation of the navigable airspace and of airport
> traffic capacity at public-use airports.

There is no violation of the cited statute.

First, the Federal Aviation Act does not create a private right of action, either

explicitly or implicitly.  See Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 97 (2d Cir.

1986); Spinner v. Verbidge, 125 F.Supp.2d 45, 51 (E.D.N.Y. 2000) (analyzing the FAA's

legislative history and enforcement provisions, and holding "[a] private right of action, in short,

was neither intended by Congress, either explicitly or implicitly, nor is inferring such a remedy

---

[8] Any further discovery on the issue would be futile, and Plaintiffs are denied leave to amend the Complaint.

generally consistent with the legislative scheme of the FAA"). Since there is no private right of action, Plaintiffs cannot enforce the Act.

Second, the Act directs the Secretary of Transportation to issue orders and/or regulations concerning air safety. See 49 U.S.C. § 44718(a). If the statute has been violated, the remedy would be against the Transportation Secretary, not the City.

Finally, the Secretary has promulgated regulations, set forth at 14 C.F.R. Part 77.[10] Furthermore, the Secretary conducted appropriate proceedings starting as early as November 2004, when the City provided notice to the FAA of its intentions to reconstruct and operate the North Shore Marine Transfer Station. Thereafter, the FAA initiated numerous studies and regulatory proceedings.[11] See Paskar v. United States Dep't of Transp., 714 F.3d 90 (2d Cir. 2013). Plaintiff's action to compel these activities is therefore moot.

---

[10] § 77.1 Purpose.

    This part establishes:
(a) The requirements to provide notice to the FAA of certain proposed construction, or the alteration of existing structures;
(b) The standards used to determine obstructions to air navigation, and navigational and communication facilities;
(c) The process for aeronautical studies of obstructions to air navigation or navigational facilities to determine the effect on the safe and efficient use of navigable airspace, air navigation facilities or equipment; and
(d) The process to petition the FAA for discretionary review of determinations, revisions, and extensions of determinations.

[11] The FAA conducted aeronautical studies in 2006 and 2008, both of which resulted in findings that the North Shore Marine Transfer Station created "No Hazard" to air navigation. Paskar v. United States Dep't of Transp., 714 F.3d at 93. In the wake of the "Miracle on the Hudson," the FAA made a showing that it complied with an FAA Advisory Circular that states that enclosed waste-handling facilities, when not located within the Runway Protection Zone or on airport property, are compatible with safe airport operations. Id. In 2009, the Secretary of Transportation Ray LaHood appointed an expert panel consisting of FAA, USDA, Port Authority, City, and other experts to assess the transfer station's safety. Id. at 94. The panel's report was issued in 2010. Id. In September of 2012, the FAA, in a detailed Directors' Determination, thoroughly addressed Plaintiffs' Complaint against the Port Authority, which alleged that the creation of the North Shore Marine Transfer Station created unsafe conditions at LaGuardia and that building the MTS violated FAA policies, standards, and specifications. See generally Paskar v. Port Authority of New York and New Jersey, FAA Director Determination, Docket 16-11-04 (Sep. 27, 2012). The FAA Director determined in a methodical analysis that the creation of the transfer station does not create an airport hazard and the Port Authority is in compliance with all Grant Assurances. Id.

## CONCLUSION

The City's motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure is granted and the Amended Complaint is dismissed. The Clerk of Court is directed to

enter judgment and close this case.

Dated: New York, New York
       March 10, 2014

SO ORDERED

PAUL A. CROTTY
United States District Judge

14